

UNITED STATES OF AMERICA

v.                                    Criminal No. 3:18-cr-002

JERRELL JOSEPH BLAKEY

## MEMORANDUM OPINION

This matter is before the Court on DEFENDANT'S MOTION TO SUPPRESS STATEMENTS (ECF No. 12). For the following reasons, the motion will be granted.

## BACKGROUND

This case involves the prosecution of Defendant Jerrell Blakey for possession of heroin and cocaine hydrochloride with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C). Indictment 1-2. Blakey argues that certain incriminating statements he made to law enforcement should be excluded because he was not advised of his rights as required by Miranda v. Arizona, 384 U.S. 436 (1966). Def.'s Br. 1.

## STATEMENT OF FACTS

To meet its burden, the Government put on the testimony of Officer Thomas Kline, a member of the Chester County Police Department assigned to a DEA task force, and it introduced a

video[1] and audio recording of the encounter between Blakey and the police officers. The defense also called a witness. The findings of fact are based on that record.

On October 27, 2017, Kline received a tip about an individual dealing heroin and cocaine. The tip identified the individual as Blakey and provided his address, among other information. After running a criminal history check, Kline found that Blakey had several narcotics convictions and was on probation.

Kline and another task force officer then drove to the address provided, which was a boarding house in which Blakey and his girlfriend, Natasha Robinson, occupied a room. Robinson permitted the officers to enter and search the room that she and Blakey shared (to which Robinson had complete access). The search revealed sandwich bags, brownish-tan powder packaged in small bags, white powder packaged in small bags, a scale, and various paper documents in drawers belonging to Blakey. Kline collected the evidence, gave Robinson his phone number, and asked her to have Blakey call him once he returned from work.

Kline later received a call from a phone number he did not recognize. When he returned the call, Blakey identified himself. Kline asked if Blakey would like to speak with him. Blakey

---

[1] A transcript of the video is Defendant's Exhibit 1 ("Def.'s Ex. 1").

agreed, and Kline stated that he would come by the residence and would call when he was close.

Kline returned to Blakey's boarding house with Officer Timothy Walker. Kline called Blakey, said that he was parked downstairs, identified his vehicle (a black, unmarked Ford Edge), and asked Blakey to come down. Kline was in the driver's seat and Walker was in the back seat, both in plain clothes. Blakey entered the car, and Kline recorded the conversation on his cell phone.

The conversation began with Kline telling Blakey that: "we gonna drive off . . . . So we'll just go down the street here real quick so we can talk a little bit aways away." Def.'s Ex. 1, 1. Kline testified that they drove away "in case somebody did walk by that knew Mr. Blakey," especially given that narcotics are dealt in the area. Feb. 28, 2018 Hr'g Tr. 14. The officers drove for a short distance and stopped, and a conversation with Blakey ensued.

The officers began the conversation cordially, and they asked if Blakey had any weapons. Walker inquired if Blakey worked for the City of Richmond, and Blakey responded, "I just got on with the City like 30 days ago, so I'm on like a year probation." Def.'s Ex. 1, 1. Kline then told Blakey that the officers "got some information that you were doing a little bit of dealing" and that: "Obviously, you know what we got out of

your place. It was in the drawer." Def.'s Ex. 1, 2. And, he warned:

> All I'm going to ask you at this rate -- at this point is you be straight with me. As long as you're straight with me, then we can drive back around and drop you right back off. What I don't want is any -- any bulls**t, or anything like that, because if you do that, like I said, you're -- you're here on your own to talk to me.

Def.'s Ex. 1, 2. After giving this admonition, Kline noted that "I ain't forcing you to do nothing." Def.'s Ex. 1, 2.

Kline then repeated, however, that: "we got some dope and we got some powder in your room. It was in your drawer. Obviously, you know where it is with the baggies and the scale, all that kind of stuff. So that's where we're at right now, okay?" Def.'s Ex. 1, 2. He also said: "So I got your history. So I know how many times you've been convicted. . . . You know what you're looking at, right? . . . . What do you think -- what do you think you're looking at?" Def.'s Ex. 1, 3.

In response, Blakey made several incriminating statements. For example, he revealed: "I ain't going to sit here and say I don't do a little something, but I don't -- I don't -- it's not like that. . . . What it was is I f**king caught a -- I f**king caught an opium habit." Def.'s Ex. 1, 3. He explained, however, that: "I'm trying to get straight. So once I get straight, man, this s**t, I'm done with this s**t." Def.'s Ex. 1, 4.

4

Kline then asked, "[w]hat you're telling me is the stuff we found is personal use and you don't deal, is that -- is that your story?" Def.'s Ex. 1, 4. Blakey responded: "Yeah, some of it is. It's -- it's half and half." Def.'s Ex. 1, 4-5. Kline also raised several additional questions as to Blakey's dealing. After Blakey answered, Kline said: "With that being said, cool. I appreciate you being straight with me because if you're coming in here and just you're going to be like I don't know nothing about nothing, then I couldn't do nothing for you." Def.'s Ex. 1, 5. Kline then asked several specific questions about the drugs found in Blakey's room, and Blakey shared the requested information. One of the questions involved who Blakey's source was, and Blakey told Kline that he got the drugs from "some Mexican dudes." Def.'s Ex. 1, 7.

Kline inquired of Blakey if he had his phone with him, and Blakey said that he had no phone. Kline then exclaimed: "Yo, look at me. You've been straight so far. Don't lie about your phone number. That ain't the way to go, bro. . . . [I]f you were going to lie, you should have lied already. Lying and saying I ain't got a phone don't f**king work. That don't work." Def.'s Ex. 1, 7. In response, Blakey provided his phone number.

The officers proceeded to raise detailed questions about Blakey's source, such as the source's name, what Blakey bought, what Blakey paid, how frequently he purchased drugs, how long

Blakey had been dealing with the source, and where they met. Blakey provided this information, including that his source's name was Gordo.

Kline requested of Blakey: "If I give you some money, are you able to buy me some dope? . . . . [T]hink about that before you answer." Def.'s Ex. 1, 13. Blakey responded: "Yeah. Because I'm saying like y'all -- like I'm f\*\*ked up now because I don't have nothing, so it's like --." Def.'s Ex. 1, 13. Kline interjected, however, "[w]ell, do you want to have nothing and be in jail?" Def.'s Ex. 1, 13. Blakey answered: "I give up that s\*\*t. I want -- man, I'm trying to just go back to work. I'm done with that s\*\*t." Def.'s Ex. 1, 13-14. Kline countered: "Well, you've got to be done doing this s\*\*t then. . . . [I]f you want to go back to work, go back to work. That's fine. But right now you've got this over your head. But you ain't in jail, which is good, because it's just him and I right now." Def.'s Ex. 1, 14.

Blakey next suggested that the search of his apartment was unlawful. Kline explained that the search was lawful and that "[w]hat I want to do is you assist yourself so we don't ever have to get to that point [i.e., arguing over the search in court]." Def.'s Ex. 1, 14-15. Afterward, he again requested that Blakey buy drugs for him.

Blakey and the officers argued over whether Blakey had told Gordo, his source, about the officers seizing his drugs. The officers eventually realized that Gordo was not Blakey's source, and Walker warned Blakey: "you may have to come off that story right now, bro, because that ain't making no sense to either one of us. We've been doing this for a long time, so I don't think you talked to this dude." Def.'s Ex. 1, 18. Kline then observed, "[m]y man, I'm looking at you and you're swallowing -- you're swallowing heavy and your lip's quivering, so --." Def.'s Ex. 1, 18. Blakey explained that he was thinking about his kids. Kline responded: "Well, if you're thinking about your kids . . . . you better come off that bulls**t." Def.'s Ex. 1, 19. And, he advised: "I can work with you if you're honest. If you lie, I can't." Def.'s Ex. 1, 19.

After trying to assuage some of Blakey's fears about becoming an informant, the officers allowed Blakey to "start over." Def.'s Ex. 1, 20. Walker cautioned: "If this Mexican guy . . . is somebody that you just made up, just come clean, man. We just -- we want to look out for you. You've got a good job, you've got a family and you don't want to f**k it up." Def.'s Ex. 1, 20. Blakey revealed that he did know Gordo. Kline then asked: "You're sure? . . . . Again, we don't work for Richmond. So if you think we magically showed up at your door,

you're wrong. There's a reason we're here and there's a reason you're here. See where I'm coming from?" Def.'s Ex. 1, 21.

After additional prodding, Blakey asked what the officers wanted to know. Walker answered: "Start with the truth, man. I mean, if this ain't the guy, then let us know who it is. Let us know the number. It's not something that we gotta go out and rush and make a buy today, but it's definitely something we want to set up for next week." Def.'s Ex. 1, 22. Kline repeated that "I want you to buy dope for me," and he added: "If you can do that, say I can do that. If you can't do that, say I can't do that. Either way, I'm -- I hold no grudge against you, and I got no beef against you." Def.'s Ex. 1, 22. Walker clarified, however, that "the first option is we want to keep you employed, for one thing, for your family, you know, to get straight." Def.'s Ex. 1, 23.

Blakey then asserted that "I've got to come up with something." Def.'s Ex. 1, 23. Kline responded: "Don't come up with something. Tell me the truth. . . . The truth is, all right, I got it from this guy, this is his name, this is his number, he lives here, this is what he drives. That's the truth. It's a matter of whether you want to say it." Def.'s Ex. 1, 23. And, Walker warned: "Because if we take you to jail today, you know it's going to get reported to the City of Richmond. . . . I mean, you know, you know how hard it was get the City of

Richmond job and you're going to f\*\*k that up. . . . The ball's in your court, right?" Def.'s Ex. 1, 23. The officers and Blakey then discussed the logistics of serving as a confidential informant.

Blakey eventually revealed, in response to more questions from Kline, that Gordo was a customer of his and that he really purchased drugs from a "girl named Dha." Def.'s Ex. 1, 25. The officers asked several questions about Dha and Blakey's dealings with her, which Blakey answered.

Blakey then told the officers that, in the search of the residence, his car money had been seized. Kline responded that "I didn't take any f\*\*king money" but asked how much was missing, and Blakey said $1,500. Def.'s Ex. 1, 31. Kline inquired where he kept his money, and when Blakey would not answer, Kline said, "I guess we can take you to jail." Def.'s Ex. 1, 32. Blakey asked, "[j]ust for my money?" Def.'s Ex. 1, 32. Kline responded, "[f]or not -- not throwing me -- all I'm asking you is a simple question." Def.'s Ex. 1, 32. Blakey then revealed that the money was in his shoe.

Blakey informed the officers that the interaction had made him tense. Kline questioned whether Blakey had ever had "a more pleasant experience with two officers sitting in a car? . . . . Not in cuffs, not going to jail after just getting caught with dope and coke." Def.'s Ex. 1, 32-33.

Kline requested more information about Blakey's phone and about Dha, which Blakey provided. Kline then explained that they were going to return to Blakey's residence and drop Blakey off so that he could retrieve his phone because Kline wanted Dha's number and wanted to see her number in Blakey's phone. The officers also raised further questions about Blakey's drug dealing, which Blakey answered.

At the end of the conversation, Blakey directed the officers where to drop him off and instructed them not to "pull up too far" because he could be seen. Def.'s Ex. 1, 38. Blakey exited the car, went to his residence, and returned to show the officers his telephone. The officers then departed (without arresting Blakey). The entire conversation lasted 28 minutes.

The video and audio recording establishes that, although the discussion was mostly business-like and cordial, it did sometimes become quite heated, when, on several occasions, the officers raised their voices and employed a forceful tone.

Kline testified that he had no intention to arrest Blakey; that his purpose was to determine if Blakey could be an informant (rather than to build a case against him); that he never told Blakey that he was under arrest or that he was going

to get an arrest warrant; and that no arrest warrant had been issued for Blakey.[2]

**DISCUSSION**

## I. The <u>Miranda</u> Standard & Custody

The requirements of the Fifth Amendment of the Constitution, as interpreted by the <u>Miranda</u> line of cases, are well-established. As the Fourth Circuit has explained:

> The Fifth Amendment provides that "No person . . . shall be compelled in any criminal case to be a witness against himself." As a prophylactic safeguard for this constitutional guarantee, the Supreme Court has required law enforcement to inform individuals who are in custody of their Fifth Amendment rights prior to interrogation. Without a <u>Miranda</u> warning, evidence obtained from the interrogation is generally inadmissible.

---

[2] Blakey's girlfriend, Robinson, testified that Kline told her that Blakey was facing life in prison and that, "as long as he be straightforward with him, . . . he wouldn't get arrested." Feb. 28, 2018 Hr'g Tr. 30. The Court cannot credit Robinson's testimony. Robinson explained that she takes a variety of medications, that she felt "a little foggy," and, before she testified, the Court observed that: "She drifted in here as if she were on a cloud. Her eyes are unfocused. She kind of acts funny, and I'm concerned we have a witness who doesn't have competence." Feb. 28, 2018 Hr'g Tr. 27-29. Robinson also revealed that she takes medicine because she is suffering from PTSD and has a personality disorder. And, during the events in question, she was taking Hydrocodone, Tramadol, Tylenol 3 (which includes codeine), and other medications. Consequently, the Court concludes that Robinson's recollection is not reliable or credible.

11

United States v. Hashime, 734 F.3d 278, 282 (4th Cir. 2013) (citations omitted).

As this passage teaches, whether a defendant must have been advised of his Miranda rights can be distilled into two main issues: (1) whether the defendant was "in custody"; and (2) whether the defendant was "subjected to interrogation." See United States v. Giddins, 858 F.3d 870, 879 (4th Cir. 2017); see also Hashime, 734 F.3d at 282.

Here, only the former issue is raised. The Government does not dispute that Blakey was interrogated (or that he was not advised of his Miranda rights). See Gov't Opp'n 5; Feb. 28, 2018 Hr'g Tr. 2 ("[R]eally the sole issue here is not whether there was questioning going back and forth but rather whether or not the defendant was in custody and that's the sole issue here.").[3]

---

[3] Nor could the Government dispute that Blakey was interrogated. "[T]he term 'interrogation' under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Rhode Island v. Innis, 446 U.S. 291, 301 (1980). Here, Kline began the conversation by telling Blakey that they had found incriminating evidence in his drawers, explaining that "[a]s long as you're straight with me, then we can drive back around and drop you right back off," and asking what Blakey thought he was "looking at" in terms of a sentence for the drugs they found. Def.'s Ex. 1, 2-3. These questions indicate that if Blakey revealed incriminating information or admitted criminal liability for the drugs, he would not be arrested. Conduct of that sort by the police is highly likely "to elicit an incriminating response." And, throughout the conversation, the

12

The Fourth Circuit has described the analytical framework for determining whether a defendant was "in custody" in the following way:

> When deciding whether a defendant not under formal arrest was in custody—and thus if the <u>Miranda</u> requirements apply—a court asks whether, "under the totality of the circumstances, 'a suspect's freedom of action [was] curtailed to a degree associated with formal arrest.'" This inquiry is an objective one, and asks whether "'a reasonable man in the suspect's position would have understood his situation' to be one of custody." In other words, the court considers whether "a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave."

<u>Hashime</u>, 734 F.3d at 282-83 (citations omitted).

As explained in <u>Hashime</u>, "[f]acts relevant to the custodial inquiry include, but are not limited to, 'the time, place and purpose of the encounter, the words used by the officer, the officer's tone of voice and general demeanor, the presence of multiple officers, the potential display of a weapon by an officer, and whether there was any physical contact between the officer and the defendant.'" <u>Hashime</u>, 734 F.3d at 283 (citations omitted). "Also pertinent are the suspect's isolation and separation from family, and physical restrictions." <u>Id.</u> (citations omitted). Additional factors include the duration of

---

officers asked detailed questions about Blakey's drug dealing and narcotics contacts.

the interview, "the release of the interviewee at the end of the questioning," whether the defendant met with the officers voluntarily, and whether the police advised the defendant that he was not under arrest. Howes v. Fields, 565 U.S. 499, 509 (2012); United States v. Hargrove, 625 F.3d 170, 180 (4th Cir. 2010); Burket v. Angelone, 208 F.3d 172, 197 (4th Cir. 2000).

In addition to these factors, another consideration is whether the defendant was threatened with arrest or some other reprisal for remaining silent. One of the primary concerns motivating the Miranda protections is "the danger of coercion [that] results from the interaction of custody and official interrogation." See Illinois v. Perkins, 496 U.S. 292, 297 (1990); see also Howes, 565 U.S. at 506. This danger is manifest, for instance, where the defendant "feel[s] compelled to speak by the fear of reprisal for remaining silent or in the hope of more lenient treatment should he confess." See Perkins, 496 U.S. at 296-97; see also Howes, 565 U.S. at 512.[4]

Accordingly, numerous courts have indicated that whether law enforcement officers threatened arrest or other penalties to induce cooperation is an important element to assess in

---

[4] The Supreme Court has therefore held that "imprisonment, without more, is not enough to constitute Miranda custody" because, inter alia, "a prisoner, unlike a person who has not been convicted and sentenced, knows that the law enforcement officers who question him probably lack the authority to affect the duration of his sentence." See Howes, 565 U.S. at 512.

14

evaluating whether a defendant was in custody. See, e.g., United States v. Guarno, 819 F.2d 28, 32 (2d Cir. 1987) ("The district court also found that the agents did not threaten Guarno with arrest if he refused to cooperate. . . . Guarno therefore was not 'in custody[.]'"); Sevier v. Turner, 742 F.2d 262, 268 (6th Cir. 1984) ("We hold that if the plaintiff's factual allegations are true, then he was in custody . . . . Sevier was informed that he would be arrested if he did not appear before the Juvenile Court. During the meeting with Justice, he was told that he would be arrested before leaving the building if he did not sign the consent order."); United States v. Iverson, 166 F. Supp. 3d 350, 363 (W.D.N.Y. 2016) (holding that a defendant was not in custody at the time he made incriminating statements in part because "while the offer to give [the defendant] an appearance ticket if he consented to a search may have implicitly suggested that he would be arrested if he refused to consent, [the defendant] did not make any statements after that offer was made"); United States v. Mullins, 11-04-ART, 2011 WL 1327030, at *3 (E.D. Ky. Mar. 21, 2011) (holding that a defendant was in custody in part because "he was told that if he did not cooperate he would be arrested"), adopted, 2011 WL 1303321, at *1 (E.D. Ky. Apr. 6, 2011); United States v. Hyer, 4:09-cr-718, 2010 WL 2160911, at *16 (E.D. Mo. Apr. 29, 2010) (holding that a defendant was not in custody in part because

15

"Officer Gomez did not specifically tell [the defendant] that he would be arrested if he declined to willingly accompany him to the station"), adopted, 2010 WL 2160908, at *3 (E.D. Mo. May 28, 2010); United States v. Morris, 2:08-cr-16, 2008 WL 3896014, at *2 (E.D. Tenn. Aug. 19, 2008) (holding that a defendant was not in custody in part because "[h]e was never told that he would be arrested merely because he chose to answer no questions and leave . . . [the] defendant was under no misapprehension in that regard," and "[h]e was not threatened, nor was he promised anything"); United States v. Segal, 207 F. Supp. 2d 835, 839 (N.D. Ill. 2002) (holding that a defendant was not in custody in part because "[s]ignificantly, [the FBI report] does not state that Defendant would be arrested if he chose not to accompany SA Murphy"); United States v. Knowles, 2 F. Supp. 2d 1135, 1145 (E.D. Wis. 1998) ("Becker wanted Knowles to continue talking so he displayed the [criminal] complaint to induce Knowles into talking, i.e., if Knowles did not cooperate, he would not be leaving. It is precisely this type of coercive conduct by law enforcement personnel that the Fifth Amendment prohibits and for which Miranda warnings are intended as a safeguard."); United States v. Zahrey, 963 F. Supp. 1273, 1279 (E.D.N.Y. 1997) ("The scenario . . . is stunningly free of other indicia of an arrest. For example, there is no evidence that the police officers who performed Zahrey's modification threatened that he would be

16

arrested if he refused to cooperate."); see also Giddins, 858
F.3d at 875-77, 880 (holding that a defendant was in custody in
part because officers required him to answer questions to
retrieve his vehicle, "[a] reasonable person would have felt
unable to cease the interview and thus forfeit the opportunity
to obtain the return of his or her property," and the
defendant's car was "essential to his livelihood").

## II. Analysis

In this case, weighing the totality of the circumstances, a
reasonable person in Blakey's position would not "have felt he
or she was . . . at liberty to terminate the interrogation and
leave." See Hashime, 734 F.3d at 282-83 (citations omitted).

As the Government correctly argues, many of the factors
laid out above, without more, do not render the encounter
custodial. See Gov't Opp'n 9-10. Blakey apparently entered the
car voluntarily, there was no concerning physical contact
between the officers and Blakey, the encounter was short (28
minutes), there were only two (plainclothes) officers in the
(unmarked) vehicle, there were no physical restrictions placed
upon Blakey, and there is no evidence that the officers
displayed weapons. Moreover, although Blakey was technically
"isolated," given that the officers drove away from his
residence with him, it is clear that this isolation was for
protection rather than intimidation and that Blakey understood

this (indeed, Blakey even told the officers not to drop him off directly in front of his residence so that he could avoid being seen). Kline also indicated that Blakey was not under arrest, stating, "[b]ut you ain't in jail, which is good, because it's just him and I right now," and asking, "[n]ot in cuffs, not going to jail after just getting caught with dope and coke, you've had -- you've had a better experience?" See Def.'s Ex. 1, 14, 33. And, the main purpose of the encounter was clearly to secure Blakey's cooperation as an informant. Finally, Blakey was permitted to leave the car, on his own, to obtain his phone, and he was released at the end of the questioning.

Other factors tend to show that the interrogation was custodial. To begin, the officers employed a forceful tone and raised their voices on several occasions, presenting an intimidating atmosphere and indicating the exercise of control by the officers. Further, they used profane and somewhat intimidating language. See, e.g., Def.'s Ex. 1, 2. ("What I don't want is any -- any bulls**t, or anything like that, because if you do that, like I said, you're -- you're here on your own to talk to me."); Def.'s Ex. 1, 7 ("Lying and saying I ain't got a phone don't f**king work. That don't work."); Def.'s Ex. 1, 19 ("Well, if you're thinking about your kids . . . . you better come off that bulls**t."); Def.'s Ex. 1, 20 ("You've got a good job, you've got a family and you don't want to f**k it

18

up."); Def.'s Ex. 1, 23 ("[Y]ou know how hard it was get the City of Richmond job and you're going to f**k that up."); Def.'s Ex. 1, 29 ("Does this Gordo guy even really f**king exist honestly? . . . . This is completely f**king made up?"); Def.'s Ex. 1, 31 ("I didn't take any f**king money.").

That evidence must be considered in perspective of the evidence that Blakey was threatened with penalties on several occasions. The record shows that the officers consistently demanded that Blakey be "honest" or "straight" with them in revealing incriminating information about himself, on pain of being taken to jail that day and/or losing his job with the City of Richmond. Indeed, the interview began with Kline establishing that Blakey's honesty was a condition of his remaining at liberty. See Def.'s Ex. 1, 2 ("As long as you're straight with me, then we can drive back around and drop you right back off. What I don't want is any -- any bulls**t . . . ."). This admonition was combined with a discussion of what the officers found in Blakey's room and Blakey's criminal history, and Kline then inquired what Blakey thought he was "looking at" in terms of a sentence for the drugs that the officers uncovered.

Similar conduct occurred throughout the conversation. On no fewer than five occasions, the officers expressly mentioned the possibility of Blakey going to jail. On no fewer than three occasions, the officers explicitly raised the possibility of

Blakey losing his job. Most importantly, on at least ten occasions, the officers made clear to Blakey, either directly or in a less than nuanced manner, that he would be arrested and/or lose his job if did not answer their questions or cooperate as an informant. And, at least three times, the officers indicated that, if Blakey refused their demands, he would be arrested that day. Finally, the threat of losing the recently acquired job was expressly linked to the prospect of being taken to "jail today."

Additionally, the officers made it clear that not only did Blakey have to be honest, but he also needed to cooperate as an informant if he did not want to be arrested or lose his job. For example, after Blakey equivocated in response to Kline's request that he participate in controlled drug buys, Kline asked, "[w]ell, do you want to have nothing and be in jail?," and he stated: "But right now you've got this over your head. But you ain't in jail, which is good, because it's just him and I right now." Def.'s Ex. 1, 13-14. Kline also indicated that what he wanted was for Blakey to assist himself so that "we don't ever have to get to that point [i.e., arguing over the search of his apartment in court]." Def.'s Ex. 1, 15. Moreover, when Kline said that Blakey had the choice to serve as an informant, Walker added, "[b]ut the first option [serving as an informant] is we want to keep you employed, for one thing, for your family, you know, to get straight." Def.'s Ex. 1, 22-23. And, quickly

thereafter, Walker stated (in response to Kline's request that Blakey tell the truth): "Because if we take you to jail today, you know it's going to get reported to the City of Richmond. . . . I mean, you know, you know how hard it was get the City of Richmond job and you're going to f**k that up."). Def.'s Ex. 1, 23.

In short, by continually indicating to Blakey that he would be arrested, be taken to jail that day, and lose his job unless he became a cooperator and told the truth about his drug trafficking conduct, the officers ensured that "a reasonable person [would not] have felt he or she was . . . at liberty to terminate the interrogation and leave" (at least without giving the officers what they wanted). See Hashime, 734 F.3d at 282-83 (citations omitted). Indeed, the officers directly created a situation in which a reasonable person in Blakey's position would "feel compelled to speak by the fear of reprisal for remaining silent or in the hope of more lenient treatment should he confess." See Perkins, 496 U.S. at 296-97.[5]

The "threat of penalty" factor also places some of the "less custodial" factors detailed above in a somewhat different

---

[5] Because the issue of the voluntariness of Blakey's statements was not presented, the Court does not rule on it here. Nevertheless, it is worth noting that threats of even economic consequences can render a confession "involuntary" and thus inadmissible. See Giddins, 858 F.3d at 882-83.

light. As an initial matter, the fact that the interaction began as a voluntary encounter does not preclude its evolution into a custodial one based on the officers' conduct. See Giddins, 858 F.3d at 880-81. And, although the primary goal of the interview was to secure Blakey's cooperation as an informant, that does not change the fact that a reasonable person would not feel free to terminate the questioning without: (1) revealing incriminating information; and (2) cooperating with the police. Additionally, the officers suggested that Blakey was not under arrest (and did not arrest him), but that was because they were using the possibility of arrest as leverage.[6] Likewise, while it is true that Blakey was not arrested at the end of the encounter, that is largely because he complied with the officers' demands. Furthermore, the fact that the interview was short in duration is not to be considered in perspective of the fact that the officers' threats allowed them to obtain what they wanted quickly. Moreover, although the officers generally had a cordial demeanor and did not engage in forceful physical contact, display weapons, or employ physical restrictions, the

---

[6] The fact that Kline testified that he did not intend to arrest Blakey and did not have a warrant for him is irrelevant, given that a reasonable person would have believed that Kline's threats were genuine. See Giddins, 858 F.3d at 880 ("[T]he custody inquiry is an objective one and does not consider 'the subjective views harbored by either the interrogating officers or the person being questioned.'" (citations omitted)).

officers' threats rendered it unnecessary for them to interact with Blakey in a more severe manner. Cf. United States v. Drayton, 536 U.S. 194, 212 (2002) (Souter, J., dissenting) ("A police officer who is certain to get his way has no need to shout."). Finally, although the officers allowed Blakey to leave the car to obtain his phone, he was permitted to do so to retrieve incriminating evidence that he was compelled to share in light of the officers' threats.

In sum, considering the totality of the circumstances, the officers' repeated threats to Blakey that he would be arrested and lose his job (unless he disclosed information about his drug trafficking and became a cooperator) rendered the interrogation a custodial one. Because Blakey was subjected to custodial interrogation, the officers were required to advise Blakey of his Miranda rights beforehand. They did not do so and, therefore, Blakey's statements to the officers while in their vehicle must be suppressed. See Hashime, 734 F.3d at 282.

**CONCLUSION**

For the reasons set forth above, DEFENDANT'S MOTION TO SUPPRESS STATEMENTS (ECF No. 12) will be granted.

It is so ORDERED.

                              /s/          REP
                    _____

                    Robert E. Payne
                    Senior United States District Judge


Richmond, Virginia
Date:  March 14, 2018